979 P.2d 300 (1999)
159 Or. App. 533
STATE of Oregon ex rel. COASTAL MANAGEMENT, INC., Peter Bartell, and Linda Bartell, Respondents,
v.
WASHINGTON COUNTY, a municipal corporation of the State of Oregon, Appellant, and
Baker Rock Crushing Co., an Oregon corporation, dba Baker Rock Resources, Intervenor-Appellant.
(C960324CV; CA A95888)
Court of Appeals of Oregon.
Argued and Submitted January 5, 1999.
Decided April 14, 1999.
*302 Alan A. Rappleyea, Sr., Assistant County Counsel, argued the cause for appellant. With him on the briefs was Washington County Counsel.
Jeffrey L. Kleinman, Portland, argued the cause and filed the briefs for intervenor-appellant.
Duane A. Bosworth, Portland, argued the cause for respondents. With him on the brief was Davis Wright Tremaine LLP.
Jeffrey G. Condit, Portland, and Miller, Nash, Wiener, Hager & Carlsen LLP filed a brief amicus curiae for League of Oregon Cities.
Before De MUNIZ, Presiding Judge, and HASELTON and LINDER, Judges.
De MUNIZ, P.J.
Defendant Washington County (county) and Intervenor Baker Rock Crushing Co. (intervenor) appeal from the peremptory writ of mandamus and supplemental judgment awarding attorney fees to relators in this mandamus action under ORS 215.428(7). We affirm.
On October 28, 1994, relators applied to the county to subdivide a 9.2-acre lot into nine one-acre parcels, which would eventually be put to residential use. The property is located in a rural residential zone and is also included in a mineral and aggregate overlay district. Intervenor conducts quarry operations to the east and south of the property. On October 19, 1995, almost one year after the filing of the completed application, a county hearings officer approved the proposed subdivision, subject to conditions, inter alia, to alleviate the effects of noise from the nearby quarries. Intervenor appealed the hearings officer's decision to the county governing body. Approximately five months later, on March 16, 1996, the governing body announced its "tentative" oral decision to deny the application.
ORS 215.428(1) requires counties to take final action on permit applications within 120 days after they are "deemed complete." In the event that a county fails to comply with the requirement, the applicant may seek a writ of mandamus under ORS 215.428(7)(b) to compel the county governing body to approve the application. The writ is to issue "unless the governing body shows that the approval would violate a substantive provision of the county comprehensive plan or land use regulations[.]" Id.
Relators filed this mandamus action on March 22, 1996. On April 2, the governing body purported to issue a final decision denying the application, which set forth the particulars in which that body viewed the application as being inconsistent with the county's Community Development Code (CDC). In the mandamus proceeding, the county and intervenor used the governing body's interpretation of the code provisions in its April 2 "order" as the pivot of their contention that the granting of the application would violate the provisions. Relators took the opposite view of the meaning and effect of the provisions.
CDC 350-6.1, pertaining to lot size in the rural residential district, provides, in relevant part:
"The minimum lot area except for a lot of record shall be:
"A. Five acres; or
"* * * * *
"C. Through a Type II procedure, a lot less than four (4) acres, but no less than one (1) net acre may be approved upon findings that the lot[ ]"
will satisfy various standards, including the proviso in paragraph (4) that the "intent and purpose of this district is not violated." CDC 379-1 sets out the "intent and purpose" of the mineral and aggregate overlay district, as distinct from the rural residential district.[1] *303 In addition, CDC 379-14 contains development standards within the "District B" portion of the overlay district, where the property is situated.[2] That section provides, in relevant part:
"In addition to the development standards required by the primary land use district, the establishment of noise sensitive uses and the creation of new parcels that are eligible for a dwelling within Mineral and Aggregate Overlay District B shall be subject to the following.
"* * * * *
"379-14.2 Noise Reduction Measures:
"Noise reduction measures may be required of the owners of new noise sensitive uses constructed after the establishment of District B when determined by the Review Authority to be necessary to ensure compliance by the District A use with applicable noise regulations. Noise reduction measures may include, but not be limited to, vegetative buffers, berms, walls, insulation and orientation of windows, and shall be determined by the Review Authority."
The county and intervenor argued below, as they do here, that the approval of relators' application is subject to the quoted and cited provisions of CDC section 379, as well as the provisions of CDC section 350. Although the latter provisions relate to the rural residential district and CDC 350-6.1(c)(4) requires consistency with the "intent and purpose of this district," the county and intervenor assert that the emphasized word must include the intent and purpose provisions of the overlay district as well as those for the primary district to which CDC 350-6.1(c)(4) directly relates. They reason that the overlay district, as well as the primary district, is, in fact, part of the same physical location as this particular rural residential area and, further, that the "intent and purpose" provisions of the overlay district would be eviscerated if they were inapplicable to situations such as this one. Intervenor and the county also contend that CDC 379-14.2 is applicable to relators' application by its terms and that the proposed subdivision cannot complyor was not shown to be capable of compliancewith its requirements of mitigating noise from the quarry operations. Finally, the county and intervenor assert that the trial court should have deferred to the interpretation of the county provisions in the April 2 order, regardless of how the court itself might have interpreted the provisions independently.
The trial court disagreed with the county and intervenor about the applicability of CDC 350-6.1(c)(4) and about the deference issue. It agreed that CDC 379-14.2 was an applicable standard but, after taking evidence from both sides' experts, concluded that the noise control requirements of that section could be satisfied by the use of hay barriers.[3]
*304 The county argues in its second assignment of error and intervenor argues in its only assignment that the trial court erred in its interpretation and application of the various code provisions. As summarized above, they maintain that the intent and purpose section of the overlay district, CDC 379-1, is implicitly incorporated by the reference to this district in CDC 350-6.1(c)(4). We find the argument to fail as a matter of law. It is difficult to imagine a term that is less open to the implication that it includes something beyond its specific referent than the word "this." The provisions in CDC section 350 relate to a particular kind of rural residential district. Like any other kind of zone, it can be subject to overlay zoning. That does not, ipso facto, make all of the local provisions that pertain to the overlay district applicable to all of the usesor their approvalin the primary zone.
That, of course, is not to say that the provisions pertaining to the primary zone, the overlay zone, or both, cannot be reciprocally or mutually applicable or cannot specify whether and to what extent they are. However, nothing in CDC 379-1 suggests that it is applicable as an approval criterion for uses in the primary residential zone. Notably, that is in marked contrast to CDC 379-14, which expressly makes its provisions applicable "[i]n addition to the development standards required by the primary land use district[.]" Hence, when they intended to do so, the drafters of the county's code knew how to make the overlay district provisions applicable as approval criteria for uses in the primary district, as they did in CDC 379-14, and did not do in either CDC 350-6.1 or CDC 379-1.
Further, as intervenor and the county read CDC 379-1, it would effectively bar any new residential development that has a propensity to conflict with aggregate useseven when the principal putative conflict, as here, is that the anticipated noise from the aggregate use will constitute a burden on the residential use. If such a stringent regulatory barrier had been intended, it would not have made sense for the county to retain the residential zoning as the primary one or to confer mere overlay status on the aggregate use. We conclude that the trial court did not err in holding that CDC 379-1 has no bearing here.[4]
As indicated, however, CDC 379-14 is applicable to relators' application by its terms, and intervenor and the county argue that the allowance of the proposed use is contrary to the part of that provision codified as CDC 379-14.2. The trial court heard conflicting expert evidence and found that the noise mitigation requirements of CDC 379-14.2 could be satisfied through the use of barriers. Intervenor's argument consists, in the main, of a recitation of the evidence at trial and uncharitable characterizations of relators' evidence and the trial court's findings.
However, intervenor's starting premise is that our review in this mandamus case is de novo. That premise is wrong, and intervenor's argument collapses with its premise. An uninterrupted parade of Oregon Supreme Court and Court of Appeals *305 cases, dating at least from Beard v. Beard, 66 Or. 512, 521, 133 P. 797, 134 P. 1196 (1913), through State ex rel Curry v. Thompson, 156 Or.App. 537, 541, 967 P.2d 522 (1998), hold that mandamus proceedings are actions at law and that the appellate courts review the findings in them to determine if they are supported by any evidence. See also ORS 34.240. The cases on which intervenor bases its contrary understanding have nothing to do with the scope of appellate review of the findings.
The county argues further that the trial court erred in that the standard it applied to the CDC 379-14.2 issue was whether the requisite noise mitigation measures were possible, while the appropriate standard was the putatively more exacting one, endorsed in the governing body's April 2 order, of whether they were feasible. However, especially given its apparent view that ultimate compliance with CDC 379-14.2 cannot be measured until the new lots are sold and actual residential development is undertaken, the county offers no explanationaside from dire predictionsas to why the text and context of the code provision better lend themselves to a "feasibility" than to a "possibility" test. Moreover, the county postulates but offers no reason why a different result could follow in this case under the word it chooses than under the one the trial court chose. Much as the county and intervenor may regard the trial court's hay barrier solution as an object of derision, one term that does appear in the text of CDC 379-14.2, as an example of a satisfactory mitigation measure, is "vegetative buffers"a term that is fully consistent with the evidence and the finding that the hay barriers could suffice. See State ex rel. Lowell v. Eads, 158 Or.App. 283, 287-88, 974 P.2d 692 (1999). We agree with the trial court's interpretation and application of the code provisions.
The county argues,[5] however, that the trial court should not have interpreted the provisions independently but, instead, should have deferred to the governing body's interpretation of them in its April 2 order. The county contends that the deference principle of ORS 197.829, Clark v. Jackson County, 313 Or. 508, 836 P.2d 710 (1992), and Gage v. City of Portland, 319 Or. 308, 877 P.2d 1187 (1994), should apply in mandamus proceedings under ORS 215.428(7) (and ORS 227.178(7), the analogous statute applicable to cities). The county recognizes that we rejected precisely the same contention in State ex rel. Currier v. Clatsop County, 149 Or.App. 285, 290, 942 P.2d 847 (1997), but asserts that "this case provides a better forum" than Currier "for addressing this important issue." The county also recognizes that, in State ex rel. Compass Corp. v. City of Lake Oswego, 319 Or. 537, 878 P.2d 403 (1994), on which we relied in Currier, the Supreme Court indicated that the circuit court's role in mandamus cases differs from that of LUBA in reviewing local land use decisions. According to the county, however, that difference should apply only to questions of fact, while the circuit courts should extend the same deference to a governing body's legal interpretations of local enactments that LUBA must under the Clark principle.
We do not agree with the county's understanding of Compass Corp. The court said there, in explaining the different principles that apply in the LUBA and mandamus settings:
"Under ORS 197.829, LUBA must affirm a local government's interpretation of [local land use] provisions unless it is not consistent with the express wording, purpose, or policy of those provisions, or of a state law that those provisions implement. By contrast, under ORS 227.178(7),
`[t]he writ shall be issued unless the governing body shows that the approval would violate a substantive provision of the city comprehensive plan or land use regulations as defined in ORS 197.015.' (Emphasis supplied.)" Compass Corp., 319 Or. at 544-45, 878 P.2d 403 (footnote omitted).
Thus, the contrast that the court drew in Compass Corp. was between ORS 197.829, *306 the statute that codifies the Clark principle of deference to local interpretations, and the affirmative showing that a city or county must make under the applicable mandamus statute. The clear point of the court's comparison is that the deference to local legislative interpretations that is required of LUBA by ORS 197.829 does not obtain in mandamus actions under ORS 215.428 or ORS 227.178.
Moreover, there are two additional reasons why that is so. First, the deferential principle is a product of statute or statutory construction, and the statutes that embody itORS 197.829 and ORS 197.835(7)(a) as construed in Clarkrelate only to the process by which LUBA and the appellate courts in appeals from LUBA review land use decisions. Neither statute has any application to circuit court proceedings generally or to mandamus actions specifically. See Clackamas County v. Marson, 128 Or.App. 18, 23 n. 2, 874 P.2d 110, rev. den. 319 Or. 572, 879 P.2d 1286 (1994).
Second, as explained in Compass Corp.:
"LUBA reviews a local government decision. The predicate for a mandamus proceeding under ORS 227.178(7) is the local government's failure to make a timely final decision on an application. Because the local government has failed to make a decision, the mandamus proceeding is not a process for `review' of a local government's decision." 319 Or. at 544, 878 P.2d 403.
In the absence of a decision, there can, of course, be no authoritative interpretation by the local decision maker to which deference can be accorded. See, e.g., West v. Clackamas County, 116 Or.App. 89, 840 P.2d 1354 (1992); Larson v. Wallowa County, 116 Or.App. 96, 840 P.2d 1350 (1992).
The county maintains, however, that, given that its governing body in fact rendered an interpretation of the local provisions through its April 2 order, the "only reason not to defer" to its interpretation "would be punitive." The county is mistaken. Its untimely putative decision, made after the mandamus action was brought, is a nullityat least for any purpose relevant to the proceedings on or disposition of the action. See Compass Corp., 319 Or. at 545, 878 P.2d 403; State ex rel. Fraley v. Deschutes Cty. Bd. of Comm., 151 Or.App. 201, 208, 948 P.2d 1249 (1997), rev. den. 327 Or. 305, 966 P.2d 219 (1998). The circuit court did not err by refusing to defer to the local interpretation, or in any other way that the county or intervenor assert in connection with the merits of the action.[6]
We turn to the county's assignments relating to the award of attorney fees against intervenor and it.[7] ORS 34.210(2), a provision of the "general" mandamus statutes, authorizes the
"court in its discretion [to] designate a prevailing party and award attorney fees, costs and disbursements to the prevailing party[.]"
In State ex rel Aspen Group v. Washington County, 150 Or.App. 371, 946 P.2d 347 (1997), rev. den. 327 Or. 82, 961 P.2d 216 (1998), we specifically held that attorney fees were awardable pursuant to that statute in mandamus actions under ORS 215.428(7). See also State ex rel. Compass Corp. v. City of Lake Oswego, 135 Or.App. 148, 898 P.2d 198 (1995) (same in action under ORS 227.178(7)). The county acknowledges as much, but takes the view that our conclusion in Aspen Group is inconsistent with the Supreme Court's decision in Murphy Citizens Advisory Com. v. Josephine County, 325 Or. 101, 934 P.2d 415 (1997). Consequently, the county asks us "to re-examine this issue as [Murphy Citizens] was handed down during the pendency of the Aspen Group appeal." The county's point is elusive, because the Murphy Citizens decision preceded and was *307 discussed at some length in our opinion in Aspen Group, in connection with the precise issue in question here. See Aspen Group, 150 Or.App. at 376-77, 946 P.2d 347. We adhere to the conclusion we reached there.
We also held in Aspen Group that awards under ORS 34.210 are subject to the general guidelines for discretionary statutory attorney fees set forth in ORS 20.075. Subsection (1) of that statute provides:
"A court shall consider the following factors in determining whether to award attorney fees in any case in which attorney fees are authorized by statute and in which the court has discretion to decide whether to award attorney fees:
"(a) The conduct of the parties in the transactions or occurrences that gave rise to the litigation, including any conduct of a party that was reckless, willful, malicious, in bad faith or illegal.
"(b) The objective reasonableness of the claims and defenses asserted by the parties.
"(c) The extent to which an award of an attorney fee in the case would deter others from asserting good faith claims or defenses in similar cases.
"(d) The extent to which an award of an attorney fee in the case would deter others from asserting meritless claims and defenses.
"(e) The objective reasonableness of the parties and the diligence of the parties and their attorneys during the proceedings.
"(f) The objective reasonableness of the parties and the diligence of the parties in pursuing settlement of the dispute.
"(g) The amount that the court has awarded as a prevailing party fee under ORS 20.190.
"(h) Such other factors as the court may consider appropriate under the circumstances in the case."
ORS 20.075(2) spells out the factors that a court must consider in setting the amount of an attorney fee award. ORS 20.075(3) provides:
"In any appeal from the award or denial of an attorney fee subject to this section, the court reviewing the award may not modify the decision of the court in making or denying an award, or the decision of the court as to the amount of the award, except upon a finding of an abuse of discretion."
The county argues that the trial court failed to exercise the discretion required by ORS 20.075(1), in that it made no finding as to some of the factors and "applied the wrong standard" as to others. Alternatively, the county asserts that the trial court abused its discretion in awarding attorney fees.
To facilitate the discussion that follows, we quote at some length from the trial court's oral comments regarding the attorney fee award:
"So the land owner seeks to have a court order the county to grant the application or show cause why they shouldn't grant it. And because they took so long it brought it out of thebecause the county took so long it brought it out of the political realm and into the judicial realm.
"Counsel suggested a requirement was securing a broader public benefit. It seems to me that the broader public benefit here is to require the county to act according to law and to act with some dispatch. And that when they don't, they can't then be heard to say well, we're supposed to act in 120 but that's okay[,] the law doesn't apply to us. We can act whenever we get around to it. Even though it's three or four or five times longer than we are supposed to take to act.
"So it seems to me the broader public benefit here is to require the county to, as one of the county businesses would say, `Just do it,' and do it on time. And so that is one of the broader public benefits to do it on time.
"The statute says that if you don't do it on time there [are] some things that an applicant can do to force the issue and writ of mandamus is one of those. * * *
"* * * * *
"So I believe that [the] land owner is entitledthe applicant is allowed attorney fees in this case as well [as] in 20.075.

*308 "You havethere has been an objection to attorney fees talking about the conduct of the parties and the transactions or occurrences that give rise to the litigation. In this case, it's, of course, just the situation of one land owner trying to prevent another land owner from doing something on that land owner's property. The applicant's property.
"The objective reasonableness of the claims and defenses[,] I think * * * everything was reasonable. The extent to which an award of attorney fees would deter others from asserting good faith claims. And here it seems to me that the good faith claim is on the part of the applicant, land owner, and the lack of an award of attorney fees would seem to be to deter others from asserting their claims or defenses. Whether it would deter others from asserting meritless claims or defenses it seems to me that about all it would do here would be to compensate the applicant and to tell the county you've got to act with some dispatch."
Some of the county's specific points in connection with its challenge to the sufficiency of the findings on the attorney-fee issue are duplicated in, and will be discussed in connection with, its assertions that the trial court abused its discretion by awarding attorney fees. With those exceptions, however, the county's arguments concerning the findings do not require extensive discussion. The court's oral recitation was sufficient to impart its rationale for the award under the Supreme Court's decisions in McCarthy v. Oregon Freeze Dry, Inc., 327 Or. 84, 957 P.2d 1200, on recons. 327 Or. 185, 957 P.2d 1200 (1998), as explicated by us in Wright v. Jones, 155 Or.App. 249, 253, 964 P.2d 1048 (1998).
The county's contention that the court abused its discretion by awarding the fees has two facets: first, that the award was inconsistent with the "public benefit" standard for attorney fees under ORS 34.210 that we articulated in State ex rel. Pend-Air v. City of Pendleton, 145 Or.App. 236, 929 P.2d 1044 (1996), rev. den. 325 Or. 45, 934 P.2d 1125 (1997); and second, that the award is not supportable under the ORS 20.075(1) factorsat least as the trial court applied them.
In Pend-Air, the defendant city refused to place an initiative measure on the ballot on the ground that the procedures that were followed in gathering the petition signatures violated applicable state statutes. The relators brought a mandamus action to compel the city to place the measure before the voters. Although the trial court agreed with the city that the gathering of the signatures had been carried out in violation of the election statutes, those provisions did not expressly prescribe that the measure should be kept off the ballot as a consequence. Based on that statutory silence, the trial court issued a peremptory writ compelling the city to conduct an election on the measure. The relators then moved for attorney fees under ORS 34.210, but the trial court declined to award them.
The trial court's ruling on the merits was not challenged on appeal. However, the relators appealed to us from the court's refusal to award attorney fees. We affirmed. We first noted, by reference to cases of related kinds, that,
"[w]ithout purporting to identify all pertinent criteria in any mandamus proceeding, we are persuaded that a prevailing relator's success in securing a broader public benefit militates in favor of an award of fees pursuant to ORS 34.210(2)." 145 Or.App. at 247, 929 P.2d 1044.
Although we implicitly agreed with the relators that their action had produced a "broader public benefit," we concluded in effect that that was overcome by other considerations that militated against an award of attorney fees. We explained, again by reference to cases from other areas of the law that we found analogous:
"The same functions that could `properly be ascribed' to former ORS 183.495 could also be properly ascribed to ORS 34.210. See McKean-Coffman v. Employment Div., 314 Or. 645, 650, 842 P.2d 380 (1992) (`An award of attorney fees [when an agency has acted reasonably], while certainly encouraging to individual litigants as petitioner, could have the undesirable effect of discouraging agencies from vigorously advocating *309 reasonable policy positions in the courts.'). Moreover, defendants' interpretation of the complex of state statutes and local ordinances, which underlay their refusal to place the initiative on the ballot, was reasonable. Indeed, the trial court determined that defendants were correct in concluding that former ORS 250.265(2) and (5) controlled and that relators' petition and signature sheets did not comply with that statute. Thus, the court granted relators relief not because defendants had unreasonably interpreted the law but because
`the legislature * * * has not bothered to give us any indication as to what should be done if they don't follow the provisions of the law. It makes a lot of sense to me that all of the petitions that were circulated should have had that notice on them but since the legislature * * * does not bother to tell us what they want us to do, the court feels that, given all of the circumstances in this case, that the matter should be allowed to go to the people.'
"Relators prevailed, then, not because defendants' failure to act was grounded in an unreasonable interpretation of the law, but because the trial court resolved an extremely close issue of first impression in their favor." Pend-Air, 145 Or.App. at 250-51, 929 P.2d 1044 (footnote omitted).
The county attempts to analogize itself to the defendant city in Pend-Air and to analogize relators here to the parties who brought the mandamus action in that case.[8] It asserts that no public benefit resulted here; rather, it states:
"The only person who benefitted here was the developer. The public did not benefit from being excluded from the land development process."
The county argues further that, as in Pend-Air, the "only reason [relators have] won was because the trial court resolved an extremely close issue," i.e., whether the approval of relators' application would violate the county ordinances.
The difficulty with the county's efforts to analogize the two cases is that there is a fundamental difference between Pend-Air and this case. In the former, the questions of whether the city had a mandatory duty or failed to perform any legal requirement turned directly on the "close issue" to which our opinion referred. If the city's understanding of the effect of the election laws on the viability of the measure had been correct, its actions would have been completely lawful. In this case, conversely, it is undisputed that the county violated the 120-day requirement of ORS 215.428(1). If the county were correct about the ancillary question that it regards as a close one here, it would have had a defense to the compulsory remedy of ORS 215.428(7), but its underlying violation of ORS 215.428(1) would in no way be altered or obviated.
Moreover, the principal basis for the trial court's decision to award attorney feesunder the Pend-Air rationale and, as we read its comments, under ORS 20.075 as wellwas that the
"broader public benefit here is to require the county to act according to law and to act with some dispatch. * * * They can't then be heard to say, well, we're supposed to act in 120 but that's okay[,] the law doesn't apply to us. We can act whenever we get around to it."
In other words, the county's violation of the statutory 120-day requirementand not anything related to its defense based on its understanding of its land use regulationswas the reason why attorney fees were awarded against it by the trial judge.
The trial court's reasoning in that respect is very much in accord with our observations in Aspen Group, where we explained our remand of the award of attorney fees against an intervenor who had appeared in the mandamus action to oppose the granting of the relator's application:
"Although plaintiff chose to seek attorney fees only from intervenor, the fact remains that the county was a party to this *310 action. It was also the party whose conductmore than any other'sgave rise to the litigation. It failed to perform its duty of taking final action on the application within the time prescribed by law. Insofar as the county's nonfeasance was the principal reason necessitating the action, the fact that plaintiff has chosen not to claim attorney fees from the county does not make the consideration described in ORS 20.075(1)(a) any the less a factor that weighs against an award of attorney fees from intervenor. If her conduct contributed to the need for the litigation at all, she was not the sole or main contributor to that need, and the county's contributing conduct wasin the statute's word'illegal.' * * *
"* * * * *
"We reiterate that there can be no successful mandamus action under [ORS 215.428(7) ] unless the county has violated the statutory requirement." 150 Or.App. at 379-80, 946 P.2d 347 (emphasis in original; citation and footnote omitted).
We continued, in a footnote:
"A mandamus action under ORS 215.428(7) is not a procedure that the legislature established to provide counties with an alternative to making the land use decisions that ORS 215.428(1) and other statutes require. It is a remedy that the legislature created to deal with circumstances where counties have failed to make the decisions that those statutes require them to make." Id. at 380-81 n. 7, 946 P.2d 347.
The county asserts that its violation of the statutory requirement cannot appropriately serve as a basis for an award of attorney fees here because, if it could, "each and every applicant [who brings a successful mandamus action] should get [its] fees. There is no discretion." The county's premise is wrong. The exercise of discretion and the appropriate weight to be given the various factors and considerations under the circumstances of various cases resides in the trial court or other court from which the award of fees is sought. The fact that attorney fees were awarded against the county here does not create a universal or invariable rule. In any event, this case is not one in which a slippery slope argument of the kind the county makes is particularly alluring. Almost three times the period that the statute allows for a final decision had elapsed before the county hearings officer's decision was made and intervenor initiated its appeal to the governing body, where the application lingered for more than 120 additional days before that body purported to act. Stated another way, the county is at the top end of the slippery slope it hypothesizes.
Insofar as the county's unspoken premise is that a violation of the 120-day requirement can never warrant an award of attorney fees in itself, we disagree. The effect of such a violation, and the resort to the mandamus process that may follow from it, is to subvert the basic land use scheme that the laws of this state establish. It negates the local decisionmaking role and responsibility that the statutes envision; it excludes local citizens from participation in the decisionmaking process; it aborts the LUBA review process that is designed to assure the correctness of land use decisions; and it subjects applicants to delay and to the need for and expense of a judicial proceeding to redress the county's unlawful dilatoriness. As noted above, one of the county's bases for challenging the award of fees is that the "public did not benefit from being excluded from the land development process." That statement is quite correct but, insofar as it ascribes the public detriment to relators, it puts the shoe on the wrong foot. The cause of the effect that the county decries was its own failure to comply with ORS 215.428(1).
The county makes a number of secondary arguments, which we will discuss briefly. First, it notes that the trial court found that the claims and defenses were reasonable,[9] and that that finding augurs against an award of attorney fees. However, the trial court was under no obligation to give decisive weight to that particular factor. See Wright, 155 Or.App. at 253, 964 P.2d 1048. As we *311 have indicated, the considerations that were of far greater concern to the trial court were the county's noncompliance with ORS 215.428(1) and the promotion of its future compliance with that statute.
The county argues next that the court applied an erroneous legal standard in finding that the lack of an attorney fee award would deter others from asserting good faith claims or defenses, when the concern of ORS 20.075(1)(c) is with whether an award would have such a deterrent effect. However, ORS 20.075(1)(h) expressly empowers the court to consider relevant factors other than those enumerated in the subsection's earlier paragraphs. There is nothing to substantiate the county's assumption that the court inverted the factor in paragraph (c), as opposed to considering another factorencouraging the appropriate use of the remedy provided by ORS 215.428(7)that has obvious relevance under the circumstances.
Next, the county asserts that relators should not be awarded attorney fees because they "participated in the land use process as long as [they] thought [they were] going to win," then "scampered" to the courthouse after learning of the governing body's intention to deny the application but before the decision was reduced to writing. However, we find nothing blameworthy in relators' choice to continue with the regular application process for a timenotwithstanding the county's dilatorinessinstead of invoking a judicial remedy at the first possible opportunity. In any event, the county's argument again places the shoe on the wrong foot. As the Supreme Court noted in Compass Corp.:
"If a city could avoid the mandamus remedy by denying the application on the eve of a court hearing, the incentive to make a timely decision within 120 days would disappear. Properly viewed, the approval action that the court compels through mandamus is not a second decision by the city; it is an action that the law requires as a consequence of the city's violation of the 120-day deadline." 319 Or. at 545, 878 P.2d 403.
Finally, the county contends that the trial court abused its discretion under ORS 20.075(2) in the amount of attorney fees it awarded. We reject that argument without discussion.
The award of attorney fees is not reversible under ORS 20.075(3).
Affirmed.
NOTES
[1] Section 379-1 provides:

"379-1.1 The purpose of the Mineral and Aggregate Overlay District is to protect mineral and aggregate resources for future use, to provide for the development and utilization of resources currently needed for economic development consistent with the requirements of LCDC statewide Goal 5 and to regulate resource extraction and processing activities to balance their impact on existing adjacent land uses.
"379-1.2 The intent of the Mineral and Aggregate Overlay District is to:
"A. Provide for public awareness of existing and potential mineral and aggregate resource extraction and processing activities;
"B. Establish clear and objective operational standards for the extraction and processing of mineral and aggregate resources;
"C. Simplify the review and permit processes for mineral and aggregate resource extraction and processing activities;
"D. Ensure the reclamation of lands after mineral and aggregate resources extraction activities are completed;
"E. Balance significant Goal 5 resources when evaluating and designating new mineral and aggregate sites; and
"F. Protect significant aggregate resources from new conflicting uses."
[2] As relevant here, the term "District A" refers to the part of the overlay district where quarry uses themselves are conducted. "District B" refers to adjacent areas where the impacts of the uses might be experienced.

The term "primary district" refers to the rural residential zone, as distinct from either subcategory of the overlay district. The term "district" that the code uses is synonymous with the more commonly used term "zone."
[3] Our summary of the trial court's conclusions entails a certain amount of simplification. The court's determinations on the applicability of the section 379 provisions were not simply statements of legal conclusions but, rather, were embodied in rulings on relators' motion in limine to restrict the evidence to the legal issues they deemed to be relevant under the code. Although the relevant assignments in the county's briefs are directed against the rulings on relators' evidentiary motion, its real targetlike the corresponding argument in intervenor's briefis the court's interpretation of the code and application of the code to the evidence. The county opposed the motion in limine but ceased its participation in the trial after the court ruled on the motion. It offered no evidence and objected to none.

In light of the procedural posture, it is questionable whether the county's assignment is sufficient to raise the legal arguments it now propounds. However, given the broader scope of intervenor's participation below and its assignment here, the fact that intervenor and the county have joined in one another's briefs and that our decision of the issues raised in the assignment turns mainly on the parties' legal theories rather than on any evidentiary showings that the ruling on the motion might have prevented them from making, the procedural approach that the county has followed does not impede our analysis or affect our disposition. Specifically, because we conclude that the county's underlying legal premises are incorrect, we need not decide whether the county has preserved the challenges it makes to the evidentiary rulings that followed from the trial court's different view of the legal questions.
[4] Given that conclusion, we need not address intervenor's and the county's implicit understanding that CDC 379-1 would bar the proposed use, if it were applicable. But see Bennett v. City of Dallas, 96 Or.App. 645, 773 P.2d 1340 (1989).
[5] This and the remaining claims of error that we will discuss appear in the county's briefs. As noted, however, intervenor joins in them.
[6] We reiterate that "deference," as we use the term here, is a principle of review. The fact that the principle is inapplicable in a particular setting does not mean that the adjudicative body may not consider the merits of the interpretation or other things to which it is not required to defer. See, e.g., Gage v. City of Portland, 133 Or.App. 346, 350, 891 P.2d 1331 (1995).
[7] Intervenor joins in the county's assignments but makes no separate arguments to the effect that the award of attorney fees against it was erroneous for reasons independent of those that the county offers for reversing the award against both.
[8] Pend-Air was tried before the enactment of ORS 20.075. We assume, for purposes of this case, that our analysis in Pend-Air survives that statute. See Currier, 149 Or.App. at 292, 942 P.2d 847.
[9] The court was apparently referring to the arguments concerning the interpretation of the code provisions.